24-2128 U.S. v. Ruiz. Ms. Edelman. Good morning. My name is Violet Edelman and I represent Joelle Ruiz. I would like to reserve two minutes of my time for a rebuttal. I raised three issues in the briefs and for purposes of this argument I plan to focus on the insufficiency of the evidence to prove Mr. Ruiz's non-Indian status. Now this court's recent published decision, very recent, in Hebert is directly on point and compels the outcome in this case because there is even less evidence in this case than there was in Hebert. The evidence here is clearly insufficient. Now the government in its 28-J letter strains to distinguish Hebert based on the officer's testimony in Mr. Ruiz's case about their training and experience in determining Indian status, which the government says means that their conclusions about Mr. Ruiz's lack of status meet the elemental requirement. But that simply can't be because it doesn't change the content of the testimony and the evidence in the case. The testimony about their experience in Ruiz's case actually undermines the government's argument because it primarily establishes that they didn't take any of the steps that their training and experience directed them to take. So as in Hebert, the testimony only reveals what they did not do in their investigation. They did not talk to Mr. Ruiz about his status. They did not talk to anyone who knew Mr. Ruiz about his status and they didn't check the roles of any tribe. Let me, do they have to check the roles of every tribe? Every tribe in the continental United States and outside? No. I understand this is our rule and I think Hebert is very good for you. But you know, most other circuits treat this as an affirmative defense. And it seems to me that the person who has the control of the evidence of Indian status is the defendant. So I, you know, I recognize that Hebert is a published decision. It relies on other law from this circuit, but boy, it's all, if you're asking the government to prove a negative where in order to get the proof, you say, talk to the defendant, what possible motivation does the defendant have to help the government on this factual issue? So anyway, I guess I'm venting a little bit. I think our rule's a little silly. Well, I have a couple things. I mean, first, you know, this court is bound by Hebert and the cases before it, Prentiss and its progeny. So this panel can't issue that binding precedent. I think Prentiss is well-reasoned. It offers up a thorough interpretation of the statute. And when you have something like this, that is a jurisdictional element, it's not, I don't know that there's any affirmative defense that's a jurisdictional element. Well, that's the issue, isn't it? Other circuits don't treat it like a jurisdictional element. They treat it as an affirmative defense. Well, it is a jurisdictional element because it goes to the federal government's power to prosecute crimes in Indian country, and it's based on tribal sovereignty interests. But I'd like to go back to just the question about whether it's an impossible standard for the government to meet. And it's not. I think we have two cases here where the officers did not conduct a thorough investigation. And, you know, it's true. We know from case law, they don't have to check the roles in every tribe, but there are roles you could check based on the steps that they did take in their investigation. And that might suffice. You could say, okay, he lived near Jicarilla Apache for most of his life, and the victims are members of the Cato Nation in Oklahoma, and he's born in Mexico. So let's look at the Tohono O'odham tribe and check those three tribes, right? And then that could be enough for the jury to infer something about tribal status because it ties into... If that was what was done, you would be arguing that was not enough. That's not what was done. If they had done those three things, you would have said, look, there are 570 other recognized members. If you're to be connected with the tribe for purposes of Indian status. And if they looked at 10 tribes, you'd argue that that's not enough. I might be making arguments to fulfill my duty to represent my tribe. But we'd be having a very different problem. And as well you should. I think that there's a clear test from Prentiss. There's two things that go to Indian status. There's ancestry, and there's recognition by a tribe. And then there's a framework that's now crystallized in Hebert for looking at recognition. And there are certain questions that an officer can probe. Enrollment is one of those questions, but there's also other things. So I think if you talk to people who knew the defendant, people who know a person well would know whether they receive tribal benefits or participate in life or are enrolled. I think that it's not a difficult burden. It's a burden that the government didn't carry. You're not familiar with the facts in Hebert if you think that there were all sorts of opportunities. Hebert says this was not shown, all these things weren't done. But it's really hard to see how they could have been done in that case. Well, and I think that's because perhaps they couldn't prove that element when you have somebody who has lived on tribal land. It becomes a genuine question, and so then it goes to jurisdiction. But I think in Hebert, if that one woman who testified, the stepdaughter, seemed like someone who couldn't actually testify with personal knowledge to the fact they could have asked someone else, they didn't. And the really important point is that there was no one like that in this case who testified. There was no one who knew Mr. Ruiz or testified to their familiarity with Mr. Ruiz and testified about his status. And there were people who could have done so. So right now, it's the government's burden to meet this element. And all we have is one sort of tangentially related fact about his birthplace. So, I mean, I think even in Hebert, there were other things, like the officers in their testimony said, I think they said, we didn't ask, he didn't say he was not Indian. And we checked with five tribes maybe, but no testimony about whether they heard from those five tribes. So Hebert might have been different if the officers testified to hearing back from the five tribes in Oklahoma and they all said no. I mean, at least then there would be... You know, you face that same issue in the Indian Child Welfare Act. I mean, what do you do if the tribe doesn't respond at all? You know, I mean, you are absolutely right. We are bound by Hebert. That case is very good for you. And frankly, you know, there were problems in my view with how this was done even before Hebert. So, but yeah. Let me ask you, Ms. Edelman, this panel may be bound by Hebert and Prentiss. The court is not. The court could overrule that. Is there any reason why we couldn't overrule that in this case? Then I think we'd have to send it back for retrial because, I would think so, because the defendant didn't know it was an affirmative burden on him to prove Indian status. But how do you respond to that, to this court ending up reversing in this case, but allowing a retrial based on the court, not this panel, overruling Prentiss and Hebert? Well, I would return to the thorough reasoning offered in the en banc decision in Prentiss. The wording of the statute does make it jurisdictional, even if it's an exception, which I think is sort of the reasoning offered up by those cases that make it an affirmative defense. Judge Hartz and your concurrence in Hebert, there's other case law that says if it's so closely intertwined with the definition of an offense, it has to be treated as an element. That's what we have here. We have a statute that makes the non-Indian status of the defendant a feature of exercising federal jurisdiction. If that is not what Congress meant to do, or if that's something that needs to change, then it's Congress's place to make that decision, not an appellate court to define the elements of a federal offense. There's also history of the statute where Congress added, deleted, and combined and separated the jurisdictional limitation paragraph with the first paragraph many times. So the parallel construction isn't compelled by the wording of the statute or by the history. I don't know. First of all, I think proving a negative, we know it's slightly more difficult, but it's not impossible. And there are other statutes where the government is required to prove a negative, like in 1326, which I think constitutes at least our district's largest volume of cases, and maybe the largest volume of cases in the country. And there are other statutes listed in the Hebert opinion. I'm sorry, what's the negative that has to be proved under 1326? That a person lacks authorization, I think, unlawful re-entry, so they aren't authorized to be in the country. But that's... It's been a while since I've had one of those cases, but I thought you check the government records and there's no evidence of... Someone can say there's no government record of that. Isn't that all that's necessary? I think that's true, but you'd be checking databases that directly pertain to the question. That's different than what was done here. There are other instances of proving a negative, so it's not unheard of. This is a particularly difficult negative, particularly since you can be... You don't have the connection for a tribe necessary to be an Indian under the statute, for example. Well, I think it's difficult possibly in some circumstances, although I maintain that there are just a couple things that the government could do, or even if the investigation didn't necessarily uncover it, there are questions you could ask the witnesses that would provide some tangible basis for the jury's conclusion. Here, we just don't have that. I think that there are cases where people plead guilty, and there's cases where a jury convicts, and it doesn't go up on appeal on this question because the government has done its due diligence to meet the element. I think Hebert and this case are somewhat unusual, and that Hebert is good because it does outline what really is not enough, and so it will inform investigations moving forward. But the framework that I would say that goes to... Because I think the ancestry piece is not that difficult. That's a question whether someone has Indian ancestry. It's a little more straightforward. I would say that recognition is a little mushier, but we have a that go to that question. I think if investigators can ask some of those questions or probe that inquiry, then it doesn't require some great volume of evidence to prove the negative. I'll take any further questions, but I also would like to reserve some time for rebuttal. All right. Go ahead. We'll reserve the time. Ms. Dillon. Thank you, Your Honor. Good morning, Your Honors. May it please the court, Caitlin Dillon on behalf of the United States. Given counsel's argument, I will jump right in to tell the court that the United States presented sufficient evidence at trial to establish that Mr. Ruiz was a non-Indian for purposes of federal law. This testimony is readily distinguishable from the testimony that was given in Herbert for one primary reason. In Herbert, the testimony appeared to be scattered, and none of those witnesses provided a determination or a conclusion based on either their personal knowledge or their training and experience in some investigation, and that's what we have here in Ruiz. Primarily, we have Criminal Investigator Rome Wager from the Hickory Apache Police Department, who was familiar with the defendant in that he had seen him in the community both as a community member and an enrolled member of the tribe, but also as a highway patrol safety officer. He testified to his training and experience in terms of what he looks for in cases involving child sexual abuse cases and how those cases have a federal nexus and how he has to determine the non-Indian or Indian status of the victim and the defendant. He testified that while he did not look at a tribal role, he looked at law enforcement databases that indicated that the defendant was born in Mexico, that he was likely a citizen of another country, and he confirmed and spoke with investigators from the Department of Homeland Security, and based on all of those things, Criminal Investigator Rome Wager made a determination that the defendant was non-Indian. We don't know. He says he had this discussion with Homeland Security. There's no evidence about what was discussed, what he learned. The most concrete fact we have is that Mr. Ruiz was born in Mexico, and that's not enough, is it? Your Honor is correct in that the contents of that specific conversation were not brought into the trial record. Well, and the other testimony was, this is my normal practice, but there was never any testimony, and I did that in this case. I mean, you know, I think this case, there doesn't seem to be a lot offered to try and prove this particular element. Arguably, the evidence in Hebert was stronger than we have here. The United States respectfully disagrees with that, given that this testimony is analogous that was given in Diaz and Walker. When you look at Diaz, the court found that that evidence was sufficient to establish that the victim in that case was non-Indian for a few reasons. That was related to the ancestry. That was an ancestry-specific inquiry, and the person in that case, the victim's family member, said that when they were in college, they researched genealogy and they came to a conclusion that the victim was non-Indian. We have that same scenario here, albeit with law enforcement. Law enforcement, based on their training experience, did some research. There's no, there's a mention of a government. What research? What research did they do? They said he was born in Mexico, and they had a conversation with someone in Homeland Security that we don't know what was discussed or what they learned. They didn't check tribal roles. I mean, I, you know, I guess I think that Judge Timkovich is correct, that there was a lot stronger evidence in Hebert than we have here. By the way, it just takes, you, you said his name is Herbert, and there was some confusion about that in the record. We used Hebert because that was on the court, the district court docket, but was his name actually Herbert? I am not sure, Your Honor. I might have butchered that horribly, but I am talking about the case that came out November 8th, that I will acknowledge is not great for the United States. Okay. And so when we look at Diaz and then we turn to Walker, which was obvious, was a different standard of review. The testimony that was given to Ruiz is substantially similar to the testimony in Walker that was accepted by this court. In Walker, Sergeant Lindsey testified that he had contacts with the individual. He was familiar with the individual. But let me stop you. There was no sufficiency of the evidence argument in Walker, correct? That is correct, Your Honor. It is a different standard. However, the testimony is substantially analogous in that it is a law enforcement officer doing an inquiry as they are trained to do, conducting that inquiry, and then coming to a conclusion that a defendant is non-Indian based on their training and experience. The officer in that case was cross-deputized with a tribal nation, and he was familiar with McGirt, and he testified that as part of his investigations, he had to undertake. But the court in Walker never ruled on anything to do with whether that was sufficient on Indian status. All the court ruled on was an evidentiary issue about whether that testimony could come in. That is correct, Your Honor. And the court ruled that the officer's testimony was sufficient to show that the officer had personal knowledge of the defendant. And that is the same here. Indeed, the testimony established through both primarily criminal investigator wagers testimony is substantially the same in that he had some personal knowledge of the defendant based on his duties as a highway patrol officer and as a criminal investigator, and he came to a conclusion that the defendant was non-Indian. Similarly, we have Special Agent PR Kimmel from the FBI who to his extensive training in Indian country jurisdiction, who reviewed documents that were signed by the defendant under penalty of perjury. They were government documents. All those documents said was I was born in Mexico. They didn't say I'm not an Indian. The text of those documents didn't make it into the record. Special Agent PR Kimmel testified that his conclusion that the defendant was non-Indian was partly based on the fact that he was born in Mexico, but was also based on his investigation review of government documents based on his training and experience, which informed his conclusion that the defendant was non-Indian. I think in Hebrew, the defendant also identified as Hispanic and maybe he was born in Mexico also. We didn't credit that much in that case. If it's a totality of the circumstances, it seems like it's a good start, but Hebert erects a lot of roadblocks to getting to the final destination. It does erect a lot of roadblocks. In terms of speaking specifically to the testimony in Hebert, in Hebert, there was testimony that the defendant had stated that he was half Mexican. We have substantially more here in Ruiz where we have a statement as evidence that the defendant was born in Mexico, which makes it likely that he could have been a citizen outside of the United States, which makes it much less likely that he is a member of an American Indian tribe that is distinguishing piece here. This court has recognized that racial identifiers do not go to that and are substantially different from the jurisdictional issue of non-Indian in this case. Absent any other questions on the non-Indian status, I'd like to briefly address the time frame of the indictment, as well as the fact that the Allen instruction was not coercive in this case. In terms of looking at the indictment, the district court correctly denied the defendant's motion to dismiss. The district court found that the indictment itself was constitutionally sufficient as to the elements of the offense. This indictment was reasonably particular as to time. It afforded the defendant their notice of the charges against him and importantly allowed him to defend and protect against double jeopardy. The four-year time frame alleged in the indictment is reasonable because it was drawn from Jane Doe's best recollections of when the abuse occurred, when the pattern of abuse occurred from both start four to five years old to finish seven to eight years old, and it captured the multiple instances in between. As outlined in this court's decision in Garcia-Limon, importantly this indictment balanced a few things. It allowed the government to accommodate a child victim because this court noted and cited to Valentine Viconta that these constitutionally broad time frames have been held to be constitutionally sufficient in cases involving child abuse, and so it allowed the United States to accommodate a child victim who was very young at the time that the abuse was alleged, and it allowed the defendant to be protected from double jeopardy because the United States in using this four-year time frame accurately captured the abuse as it was alleged and cannot charge the defendant again for instances of abuse involving this defendant during this time frame. Has the defendant identified any prejudice from the four-year time frame and what looks like a change from a series of molestations to a single event? I believe the defendant has not identified a prejudicial effect from what was effectively the constructive narrowing of the indictment the morning of trial, sort of a game day decision at that point by the court. The defendant was always on notice of that act as being a discrete act that Jane Doe could identify. The other 10 to 12 instances of abuse were what I would refer to as carbon copy or almost cookie cutter that the United States could not necessarily charge under prevailing case law. And when they settled on a single charge, it was a charge that occurred during the summer, is that correct? That is correct, Your Honor. It was the charge that the child had identified. She remembered pursuant to her testimony that it was warm outside. Importantly about that time frame in terms of asserting a defense, the defendant did claim that he was unable to assert an alibi defense, but due process is never required that an indictment lend itself to a specific defense. Case law from the Sixth Circuit cited in the United States Brief also notes that alibi defenses are necessarily very fact-specific and they are difficult when the defendant lives in close proximity to the child, as was noted in the testimony that the defendant was present on that spring, summer, and fall, but not in the winter. So in this case, the defendant was able to assert a fairly robust defense. He was able to call an expert who testified as to child's suggestibility and intended to inherently undermine the child's veracity and reliability at trial. Finally, the defendant was able to defend against double jeopardy. The United States has conceded throughout this case in multiple arenas that we cannot charge the defendant again for instances involving this child during that time frame. Turning to the Allen charge, since I'm running a little low on time, the modified Allen charge was not coercive in this case. The district court's instruction that was given comported perfectly with this court's pattern instruction, albeit with one removal. They removed the second paragraph that discussed cost and retrial. The language of the instruction was perfect in this case. It reminded the jury that the government bears the burden of proof and cautioned that no juror should surrender his or her consciously held convictions. And even though it is suggested and recommended by this court that instruction come with the initial set of instructions, that is not a factor in determining coerciveness. That doesn't render this instruction automatically coercive, but this instruction was given in a separate instruction. When the court gave this instruction, it only gave the instruction. It did not pull the jury in the case law, and that supports that that is not inherently coercive. In terms of the timing of the instruction, the instruction was given on at approximately 2.30 in the afternoon on the first full day of the jury's deliberations. So they had deliberated at about five hours at that point. And then in terms of the timing of the verdict after the instruction, it was about two and a half hours after the instruction was given, which this court has held previously in other cases. Arnie collects those cases. The United States cite those in the answer brief on page 28. And the two and a half hours is significantly larger than the hour that this court has previously upheld. So subject to any more questions from this court, I would ask that this court affirm the defendant's convictions, and thank you for your time this morning. Any questions from the panel? Thank you. Ms. Edelman, you have 1.39 left. I believe that the government has somewhat overstated the evidence about Mr. Officer Wager's personal knowledge of Mr. Ruiz or the testimony on that point. Everyone assumed, I think, that there was more testimony than there was, including the district court. And the government, in its closing argument at trial, also talked about Rome Wager having testified to personal knowledge and knowing that Mr. Ruiz wasn't a member of the tribe. That never happened. And I think the only personal knowledge he offered was about maybe recognizing the truck. So that really shows, had that testimony existed, we might be, again, in a indictment. I'm not sure. Let me stop you. You can't reserve an issue for appeal and then save your time so you can rebut. If you're going to make an argument, you need to do it. So I'll give you your 35 seconds to do that, but not one second more. Go ahead. Oh, well, that's okay. I'll just say that the birthplace in Mexico is not probative of the pertinent question. We know that from Ebert. We also know that from Romero. And so we all know that you can be born, your birthplace has nothing to do with your ancestry in this country. And it doesn't tie into the pertinent factors. It could maybe also with more, with checking some roles or talking to people about tribal connections. But that isn't in the record here. And for those reasons, I ask that this court remand the case and vacate Mr. Ruiz's conviction. Thank you. Thank you, counsel. Cases submitted. Counselor excused.